## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ALLOC, INC., a Delaware corporation,
BERRY WOOD S.A., a French company,

        Plaintiffs,
  v.

PERGO, INC., a Delaware corporation,
PERGO AB, a Swedish company,

        Defendants.
_____

Case No. 02-C-0736

PERGO, INC., and PERGO (EUROPE) AB,

        Plaintiffs,
  v.

ALLOC, INC., ARMSTRONG WORLD
INDUSTRIES, INC. and BERRY FINANCE NV,

        Defendants.
_____

## ORDER

On May 12, 2006, the court issued an order that construed claim terms in Pergo's United States Patent Nos. 6,397,547 ("the '547 patent") and 6,421,970 ("the '970 patent"). The court invited the parties to indicate whether any additional terms required construction by the court. (*See* Order 14, May 12, 2006.) On June 12, 2006, Alloc, Inc., Berry Wood S.A., Berry Finance NV, and Armstrong World Industries, Inc. (collectively, "Alloc") moved for additional claim construction and requested a hearing. On June 27, 2006, Alloc moved for partial summary judgment of non-infringement of the '547 patent. On July 28, 2006, Pergo, Inc., Pergo AB, and Pergo (Europe) AB

(collectively, "Pergo") filed a cross-motion for reconsideration of the court's May 12, 2006 order. The motions are fully briefed.

## I. Alloc's Motion for Additional Claim Construction

Alloc argues that the court should construe the following additional terms: "tight joint," "snapping web" and "snapping groove," and the verbs within claim 1 of the '970 patent ("providing," "defining," and "urging").

### A. "Tight Joint"

The court determined that "water tight" and "water tight joint" are terms defined within the patents: "'A joint is water tight when standing water will not penetrate the joint for several hours.' '970 patent col. 3 ll. 43-44." (*See* Order 11, May 12, 2006.) Alloc urges the court to give the term "tight joint" the same meaning that it gave the terms "water tight" and "water tight joint": "a joint that will not allow standing water to penetrate for several hours." Pergo argues that "tight joint" is broader than "water tight" and refers to a joint that will not allow water *or dirt* from penetrating the joint. *See* '970 patent col. 3 ll. 29-31 ("Of course, without any substantial gaps between the panels, water and dirt are prevented from entering the assembled panels, flooring or wall covering.").

The court determines that "tight joint" is broader than "water tight joint" and means that neither dirt nor water may penetrate the joint. With respect to water, "tight joint" means that standing water will not penetrate the joint for several hours. *See* '970 patent col. 3 ll. 40-43 (". . . to bring said panels into forming a tight joint such that the

2

joint is said to be waterproof or water tight. A joint is water tight when standing water will not penetrate the joint for several hours.").

### B. "Snapping Web" and "Snapping Groove"

The court determined that the parties failed to set forth competing definitions for the "snap terms," including "snapping web" and "snapping groove." (*See* Order 3, May 12, 2006.) The court, however, rejected Alloc's interpretation that the snap terms require that the panels be pushed together in a manner that precludes tilting the panels. (*Id.* at 3-7.) The court determined that the ordinary meaning of "snap" does not incorporate such a limitation, and the '547 and '940 patents do not define any of the snap terms in such a manner. (*Id.* at 3-4.) The court also determined that the '341 Kajiwara patent that is discussed in the patents-in-suit does not incorporate the limitation, (*id.* at 4-5), and that the Pergo inventors did not acquiesce to such a limitation. (*Id.* at 5-7.)

In its motion, Alloc appears to argue that the court should define each of the "snap terms," or at least the terms "snapping web" and "snapping groove."[1] The court, however, had no occasion to construe the "snap terms" separately because the parties failed to set forth separate definitions of those terms. In its motion for additional claim construction, Alloc urges the court to construe "snapping web" and "snapping groove" to mean "configurations on the edges of a panel that can be connected by pushing the

---

[1] Alloc begins its argument, "Alloc notes that the Court's May 12th Order indicates that snapping is not limited to 'strictly horizontal' joining. However, Alloc also respectfully notes that the May 12th Order does set forth meanings for the various terms that use the term 'snap' and cognates of that word." (Alloc's Mot. for Additional Claim Construction and Request for Hearing 4, Jun. 12, 2006.) Presumably, Alloc intends to argue that the May 12, 2006 order does *not* define various terms.

3

panels together and can be disconnected by pulling the panels apart." (Alloc's Motion 8, Jun. 12, 2006.) Alloc argues that its proposed definition allows for some non-planar motion. (Alloc's Reply Br. 10, Aug. 18, 2006.) Pergo does not propose a competing definition for "snapping web" or "snapping groove," (*see* Pergo's Br. 3-4, Jul. 28, 2006), so the court has no reason to take issue with Alloc's proposed definition or to believe that Pergo would object to such a definition. Alloc does not directly request reconsideration of the court's prior determination rejecting Alloc's "horizontal only" or planar construction of the "snap terms," and Alloc's reply brief makes clear that its proposed definition of "snapping web" and "snapping groove" does not indirectly seek reconsideration. Therefore, the court has no occasion to reconsider the issue or the parties' previously raised arguments.

### C. The Verbs Within Claim 1 of the '970 Patent ("Providing," "Defining," and "Urging")

Alloc's proposed constructions of these verbs are also in search of a fight. Pergo argues that each of the terms is obvious on its face and should be construed according to its plain meaning. In its reply brief, Alloc largely concedes that there is nothing for the court to construe. (*See* Alloc's Reply Br. 10-11.) Alloc characterizes the terms "providing" and "defining" as manufacturing steps and "urging" as an assembly step but, as the court noted in the May 12, 2006 order, (*see* Order 13, May 12, 2006), Alloc does not demonstrate that it is necessary or appropriate to characterize claim terms in this manner. Alloc also slips in an argument that the plain meaning of "urging" involves a "substantially co-planar movement of the panels," (Alloc Reply Br. 11, Aug. 18, 2006),

4

but the court does not consider undeveloped arguments. *See United States v. Jones*, 224 F.3d 621, 626 (7th Cir. 2000).

## II.     Pergo's Cross-Motion for Reconsideration

Pergo argues that the court should reconsider its construction of "bonded wood particles."

The court determined that "bonded wood particles" does not include fibers or fiberboard. (*See* Order 7-11, May 12, 2006.) The court determined that fiberboard is distinct from "chipboard" or "particle board," and that wood "fiber" is distinct from wood "particles." (*Id.*) The court noted that the United States Department of Agriculture's Wood Handbook distinguishes fiberboard from particleboard and fibers from particles. (*Id.* at 8-11.) The court noted that particleboard and medium-density fiberboard are governed by different American National Standards Institute ("ANSI") standards. (*Id.* at 9.) The court noted that ANSI A208.1-1999 defines particleboard as "a generic term for composite panel composed of cellulosic materials (usually wood), generally in the form of discrete pieces or particles, *as distinguished from fibers*, bonded together with a bonding system, which may contain additives." (*Id.*) This ANSI definition expressly distinguishes particles from fibers. The court acknowledged that particleboard and fiberboard may both be described as "wood-based composite panels" but concluded that the Wood Handbook and the ANSI standards show that fiberboard is not synonymous with, or a subset of, particleboard. The court noted that wood fiber is absent from the Wood Handbook's definition of "particles": "all small subdivisions of wood such as chips, curls, flakes, sawdust, shavings, slivers, strands, wafers, wood

5

flour, and wood wool." (*Id.* at 10.) In light of the Wood Handbook's distinction between particles and fibers in Chapter 10, the court did not believe the omission of fiber from the definition of particle to be a careless error, as Pergo suggested. (*Id.*) Lastly, the court noted that the '970 patent lists "fiber board" as an item distinct from "chipboard" or "particle board," a fact that further confirms that fiberboard is not synonymous with, or a subset of, particle board. (*Id.* at 11.)

In its opening Markman brief, Pergo argued that the ordinary meaning of "bonded wood particles" is *"*small pieces or particles of wood that are bonded together by, for example, joining wood particles in the presence of a thermoplastic, glue, resin, or other bonding agent." (Pergo's Br. on Claim Construction 10-11, Jul. 23, 2004.) Pergo, however, does not say how it derived the ordinary meaning of "bonded wood particles": in fashioning its proposed definition of "bonded wood particles," Pergo did not cite to any intrinsic *or* extrinsic evidence. (*Id.*) Moreover, Pergo did not define "particles." (*See id.*) Pergo emphasized that the intrinsic evidence did not contradict its construction of "bonded wood particles." (*Id.* at 11) ("There is no indication in the patent specifications that the patentees acted as their 'own lexicographer in explicitly setting forth a definition' of 'bonded wood particles' distinct from its ordinary meaning.").

In response to Alloc's arguments that the Wood Handbook and its expert Dr. Otto Suchsland distinguish "particleboard" from "fiberboard" and "particles" from "fibers," Pergo merely reasserted that the "ordinary meaning"–and by "ordinary meaning" Pergo presumably relies upon its particular construction of "bonded wood particles"–of "chipboard," "particle board," and "bonded wood particles" includes

6

fiberboard. (*See* Pergo's Resp. Br. 15 & n.8, Aug. 13, 2004.) Ignoring all of the ways in which the Wood Handbook distinguished particleboard and fiberboard and particles and fibers (e.g. the separate definitions of "particle" and "fiber"), Pergo argued that the Wood Handbook's definition of "particles" could be read to include fibers, an argument that the court did not find persuasive. Pergo also cited a treatise for a definition of fiberboard that indicates it could be made of wood chips, (*id.* at 15), but Pergo did not explain how the court could reconcile that definition with the Wood Handbook or why the court should deem the treatise more authoritative than the Wood Handbook. Pergo did not respond to Dr. Suchsland's opinion other than to argue that the court should not consider it because "bonded wood particles" is unambiguous. (*Id.* at 14 n.7.) With respect to the argument that the '970 patent lists "fiber board" as an item distinct from "chipboard" or "particle board," Pergo argues–weakly, the court thinks–that the '970 patent "clarifies and makes explicit what was at least implicit: the invention covers all of these broad and overlapping categories of wood-based materials." (Pergo's Reply Br. 5, Aug. 20, 2004.) The court has a healthy suspicion of assertions of "implicit meaning" as does Pergo itself. (*See* Pergo's Br. 8, Jul. 28, 2006) (citing *CAE Screenplates Inc. v. Heinrich Fielder GmbH & Co. KG,* 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.")).

In its motion for reconsideration, Pergo no longer argues that particleboard is the same as, or includes, fiberboard. Pergo no longer argues that the Wood Handbook's definition of "particles" supports its construction of "bonded wood particles." Instead,

7

Pergo argues that "bonded wood particles" has a broader meaning than "particle board" and "chipboard." Pergo argues that the court's construction of "bonded wood particles" was based entirely upon the Wood Handbook, rather than on the specification, which is improper in light of *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). Pergo also argues that "bonded wood particles" and "particle board" have the same meaning under the court's construction of those terms, an alleged breach of claim construction principles.

Pergo's more recent arguments do not persuade the court any more than Pergo's original arguments. The methodology outlined in *Phillips* is no different than the methodology the court employed in its May 12, 2006 order: the court examines the intrinsic evidence–the claims themselves, the specification, and the prosecution history–and the words in the claim are given their ordinary and customary meaning that they would be given by persons experienced in the field of the invention; the court considers whether the inventor chooses to be his own lexicographer by using terms in a manner other than their ordinary meaning and whether the inventor has disavowed or disclaimed scope of coverage; if the intrinsic evidence unambiguously describes the scope of the invention, the court does not rely upon extrinsic evidence such as expert testimony; the court may consult dictionaries, encyclopedias, and treatises as long as they are not inconsistent with the intrinsic evidence. (*See* Order 2-3, May 12, 2006.) *Phillips* does not articulate a different methodology; it reaffirms basic principles of claim construction, including the primacy of intrinsic evidence over extrinsic evidence, and clarifies that extrinsic evidence, such as technical dictionaries and treatises, may

8

properly assist the court in construing terms but must be considered in the context of intrinsic evidence and must not contradict claim meaning that is unambiguous in light of the intrinsic evidence. *See Phillips*, 415 F.3d at 1312-24.

"Bonded wood particles" is a phrase found in claims 23-24, 29, 32, and 35 of the '547 patent. (*See* Pergo's Br. on Claim Construction 10, Jul. 23, 2004.) Pergo does not rely upon the '547 patent's specification, prosecution history, or any of its claims aside from claim 23:

> 23. The flooring panel of claim 21, wherein said bonded wood particles is [sic] made of a material selected from the group consisting of chipboard and particle board, each impregnated with a resin.

(*Id.* Ex. A.) Claim 24 is very similar to, and perhaps redundant with, claim 23:

> 24. The flooring panel of claim 21, wherein said bonded wood particles is [sic] made of a material comprising particle board impregnated with a resin.

(*Id.*) Claim 21, in turn, provides:

> 21. A flooring panel for use in assembling a glueless floor, said flooring panel comprising
>
> a surface of a thermosetting laminate or a paper impregnated with a thermosetting resin said surface being *bonded to a carrier of wood particles impregnated with a plastic*; . . .

(*Id.*) (emphasis added). Pergo argues that claim 23 would be meaningless unless bonded wood particles is broader than chipboard or particle board.

Even if the court were to accept Pergo's premise that "bonded wood particles" is broader than "chipboard and particle board, each impregnated with a resin," Pergo does not point to the intrinsic evidence that demonstrates how "bonded wood particles"

9

include fibers or fiberboard. Rather than rely upon intrinsic evidence, Pergo deduces that "bonded wood particles" must include fiberboard because that is "the only other option," "the only other possibility" to the court's construction. (*See* Pergo's Br. 8-9, Jul. 28, 2006.) The basis for Pergo's deduction is extrinsic evidence that particle board and fiberboard are distinct. (*Id.* at 9) (citing "4/15/04 Issal Depo. at 122" for the proposition that "[p]ersons skilled in the art are well aware that particle board and fiberboard have for years been used as the core material for laminated flooring").

Pergo's argument is unpersuasive for a number of reasons. First, Pergo ignores intrinsic evidence that undermines its position. Claim 23 contains a "Markush group" which is "a listing of specified alternatives of a group in a patent claim, typically expressed in the form: a member selected from the group consisting of A, B, and C." (*See* Order 7, May 12, 2006) (citing *Abbott Labs. v. Baxter Pharm. Prods., Inc.*, 334 F.3d 1274, 1280 (Fed. Cir. 2003).) In the example, A, B, and C are alternatively usable, but the group is closed, so that D does not fall within the claim scope. (*Id.*) (citing *Abbott Labs.*, 334 F.3d at 1280-81.) Therefore, even if "bonded wood particles" otherwise included fiberboard, it does not in claim 23; in that claim, "bonded wood particles" may only be "made of a material selected from the group consisting of chipboard and particle board, each impregnated with a resin." In a prior version of its argument, Pergo acknowledged the Markush format but insisted that chipboard and particle board included fiberboard. (Pergo's Resp. Br. 15 n.8, Aug. 13, 2004.) In its motion for reconsideration, however, Pergo does not advance this argument, and in an extraordinary change in position, Pergo argues that particle board and fiberboard are

10

distinct. (Pergo's Br. 9, Jul. 28, 2006) (citing "4/15/04 Issal Depo. at 122" for the proposition that "[p]ersons skilled in the art are well aware that particle board and fiberboard have for years been used as the core material for laminated flooring"). This concession means that fiberboard is outside the scope of claim 23. By ignoring the Markush format of claim 23, Pergo ignores intrinsic evidence that supports the court's construction and contradicts Pergo's proposed construction.

Moreover, Pergo overlooks intrinsic evidence that the court discussed in the May 12, 2006 order: the '970 patent lists "fiber board" as an item distinct from "chipboard" or "particle board." As Pergo itself noted, in the absence of evidence to the contrary, the court presumes that the use of different terms in the claims connotes different meanings. (*See* Pergo's Br. 8, Jul. 28, 2006) (citing *CAE Screenplates Inc.,* 224 F.3d at 1317.)

Pergo's argument itself only masquerades as an argument based upon intrinsic evidence. Even if the intrinsic evidence indicates that "bonded wood particles" has a different meaning (or even a broader meaning) than "particle board," Pergo relies upon no intrinsic evidence when it weakly concludes that fiberboard is "the only other possibility" to "particle board." As an initial matter, the court suggests that "bonded wood particles" may be broader than "particle board" in that it may also include "chipboard" as the intrinsic evidence suggests;[2] or "bonded wood particles" may be broader than "chipboard and particle board, each impregnated with a resin" in that the

---

[2]Although Alloc's expert Suchsland states that "chipboard" is a "confusing term" that is similar to particle board, (Suchsland Decl. ¶ 10, Jul. 23, 2004), the terms are treated as distinct in the '547 patent.

11

bonding agent may be something other than resin. In any event, Pergo's extrinsic evidence does not establish that fiberboard and particle board are the *only* wood-based composite materials used in laminate flooring. (Pergo's Br. 9, Jul. 28, 2006.) Because Pergo's argument depends upon unpersuasive extrinsic evidence, the court need not place any greater weight on Pergo's tenuous deduction than the court placed on the clear distinction between particles and fibers in the Wood Handbook or the ANSI standards.

Pergo argues that the Wood Handbook does not contain the phrase "bonded wood particles" and that the Wood Handbook's definition of "particles" is too narrowly defined to include only the raw materials of particle board. (Pergo's Reply Br. 2-3, Sept. 5, 2006.) Pergo suggests that the "ordinary meaning" of "particles" includes "fibers." (*Id.* at 2.) As the court has already noted, however, the intrinsic evidence makes no suggestion that "particles" includes "fibers," and Pergo has not tendered any definition of "particles" or "bonded wood particles" other than its own particular definition of "bonded wood particles" that is unsupported by any intrinsic or extrinsic evidence. (*See* Pergo's Br. on Claim Construction 10-11, Jul. 23, 2004.) The authoritative treatise in the particular art field makes a clear distinction between particles and fibers, and Pergo does not persuade the court that the patentees used the word "particles" in a manner that ignores that distinction. Pergo is silent with respect to the different ANSI standards and the distinction between fibers and particles therein.

12

The court's position is further supported by the opinion of Alloc's expert, Dr. Otto Suchsland, who indicates that persons of ordinary skill in the art of using wood composite materials would understand that particles are different than fibers and that particleboard is different than fiberboard. (*See* Alloc's Resp. Br. Ex J, Aug. 13, 2004.)

For the reasons stated above, the court denies Pergo's motion for reconsideration.

### III. Alloc's Motion for Partial Summary Judgment of Non-Infringement of the '547 Patent

In light of the court's construction of "bonded wood particles," "chipboard," and "particle board," Alloc argues that it is entitled to summary judgment of non-infringement of the '547 patent because its panels are made of fiberboard, not chipboard, particle board, or bonded wood particles. (Alloc's Proposed Findings of Fact ¶¶ 1-2, Jun. 27, 2006.) Alloc argues that it does not literally infringe the '547 patent. Alloc also argues that the all limitations doctrine and prosecution history estoppel bar Pergo from claiming infringement based upon the doctrine of equivalents. (Alloc's Br. 4-5, Jun. 27, 2006.) Pergo concedes that Alloc's products do not literally infringe the '547 patent in light of the court's Markman order. (Pergo's Resp. Br. 1, Jul. 31, 2006.) However, Pergo contends that there is a genuine issue of material fact as to whether a tongue and groove made of fiberboard is the functional equivalent of a tongue and groove made of particle board. (*Id.* at 2.) Pergo argues that neither the all limitations doctrine nor prosecution history estoppel bar Pergo from claiming infringement based upon the doctrine of equivalents.

13

The doctrine of equivalents prevents competitors from circumventing an existing patent by making insubstantial changes to it. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997) ("Under this doctrine, a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention."). The all limitations rule and prosecution history estoppel act as a constraint upon the doctrine of equivalents. The all limitations rule bars application of the doctrine of equivalents if a finding of equivalence would entirely vitiate a particular claimed element. *Freedman Seating Co. v. American Seating Co.*, 420 F.3d 1350, 1358-59 (Fed. Cir. 2005). The doctrine of prosecution history estoppel creates a rebuttable presumption that a patentee's decision to narrow his claims through amendment is a disclaimer of the territory between the original claim and the amended claim. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 740-41(2002).

With respect to prosecution history estoppel, Pergo concedes that it narrowed its claims to limit the tongue and groove to "chipboard," "particle board," and "bonded wood particles." (Pergo's Resp. Br. 6, Jul. 31, 2006.) Therefore, there is a presumption that Pergo surrendered the territory between the original claim scope that did not limit the materials comprising the tongue and groove and the amended claim scope. *Festo*, 535 U.S. at 740-41. Pergo may rebut the presumption by showing that "the rationale underlying the amendment . . . bear[s] no more than a tangential relation to the equivalent in question." *Id.* at 740. In this case, Pergo argues that it limited the

14

claims to wood-based materials to distinguish the invention over prior art panels having a tongue and groove made from plastic and that the amendment had nothing to do with distinguishing particle board from fiberboard. (Pergo's Resp. Br. 6-7, Jul. 31, 2006.) Pergo cited *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841 (Fed. Cir. 2006), and argued that the rationale underlying the amendment bore no more than a tangential relationship to the equivalent in question. (Pergo's Resp. Br. 7-8, Jul. 31, 2006.)

In its reply brief, Alloc does not dispute that the amendment was made to distinguish the '547 patent from plastic materials. Alloc does not dispute that the amendment had nothing to do with distinguishing particle board and fiberboard. Alloc does not address *Primos*. The court considers Alloc's non-responsiveness to Pergo's argument to constitute an abandonment of its prosecution history estoppel argument.

Through its own research, however, the court discovered the following passage that rejoins Pergo's argument:

> [T]here is no principle of patent law that the scope of a surrender of subject matter during prosecution is limited to what is absolutely necessary to avoid a prior art reference that was the basis for an examiner's rejection. To the contrary, it frequently happens that patentees surrender more through amendment than may have been absolutely necessary to avoid particular prior art. In such cases, we have held the patentees to the scope of what they ultimately claim, and we have not allowed them to assert that claims should be interpreted as if they had surrendered only what they had to.

*Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1361-62 (Fed. Cir. 2005). Despite Alloc's abandonment of the argument, *Norian* creates an apparent tension with the cases that Pergo relies upon. To allow the parties an opportunity to address the

15

authority identified by the court, the court will deny Alloc's motion without prejudice. After the parties have an opportunity to conduct further research, they should confer regarding the merits of re-filing a motion for summary judgment.

If one or more parties should re-file a motion for summary judgment and repeat the arguments concerning the all limitations doctrine, the court offers further suggestions. Alloc argues that applying the doctrine of equivalents would vitiate a specific claim limitation by "opening" a Markush group. Neither of the cases that Alloc cites–*Gillette Company v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1372 (Fed. Cir. 2005), and *Freedman Seating*–analyze Markush groups in the context of the doctrine of equivalents. If applying the doctrine of equivalents to a claim that contains a Markush group would always vitiate a claim limitation, as Alloc suggests, Alloc should cite cases that so hold. If Alloc's all limitations argument is premised upon the vitiating of claims that contain Markush groups, Alloc should account for the claims in the '547 patent that do not contain Markush groups (e.g. claim 24). Pergo, instead of ignoring the concept of a Markush group, should cite cases in which courts have applied the doctrine of equivalents to "open" Markush groups.

Finally, Pergo moved to file its opposition brief under seal pursuant to a protective order that the court signed on August 27, 2003. Pergo's motion to seal is unopposed. While the court is reluctant to frustrate the parties' expectation that confidential information be sealed, the court does not believe that Pergo's submission contains confidential information as defined by the protective order. Therefore, the court is prepared to deny Pergo's motion. Before doing so, however, the parties may

16

file a brief in support of the motion to seal within twenty (20) days from the date of this order.

Accordingly,

**IT IS ORDERED** that Alloc's motion for partial summary judgment be and the same is hereby **DENIED** without prejudice;

**IT IS FURTHER ORDERED** that Pergo's motion for reconsideration be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Alloc's motion for additional claim construction be and the same is hereby **GRANTED**; the claim terms of the patents-in-suit shall be construed as provided for in this order;

**IT IS FURTHER ORDERED** that the parties may file a brief in support of Pergo's motion to seal within twenty (20) days from the date of this order.

Dated at Milwaukee, Wisconsin, this 24th day of January, 2007.

                                      BY THE COURT:

                                      s/J. P. Stadtmueller
                                      J. P. STADTMUELLER
                                        U.S. District Judge